Slip Op. 10-30

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                              :
ZHEJIANG NATIVE PRODUCE       :
& ANIMAL BY-PRODUCTS IMPORT & :
EXPORT CORP., et al.,         :
                              :
              Plaintiffs,     :   Before: Richard K. Eaton, Judge
                              :
     v.                       :   Court No. 02-00057
                              :
UNITED STATES,                :
                              :
              Defendant,      :
                              :
     and                      :
                              :
THE AMERICAN HONEY PRODUCERS   :
ASSOCIATION and THE SIOUX      :
HONEY ASSOCIATION,             :
                              :
              Def.-Ints.      :
_____:
```

OPINION AND ORDER

[The United States Department of Commerce's results of
redetermination pursuant to remand are remanded]

Dated: March 24, 2010

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP*
(*Bruce M. Mitchell, Mark E. Pardo* and *Ned H. Marshak*), for
plaintiffs Zhejiang Native Produce & Animal By-Products Import &
Export Corp.; Kunshan Foreign Trade Co., China (Tushu) Super Food
Import & Export Corp.; High Hope International Group Jiangsu
Foodstuffs Import & Export Corp.; National Honey Packers &
Dealers Association; Alfred L. Wolff, Inc.; C.M. Goettsche & Co.;
China Products North America, Inc.; D.F. International (USA)
Inc.; Evergreen Coyle Group, Inc.; Evergreen Produce, Inc.; Pure
Sweet Honey Farm, Inc.; and Sunland International, Inc.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*,
Director, Commercial Litigation Branch, Civil Division, United
States Department of Justice; *Reginald T. Blades, Jr.*, Assistant
Director, Commercial Litigation Branch, Civil Division, United
States Department of Justice (*Jane C. Dempsey*); Office of the

Chief Counsel for Import Administration, United States Department of Commerce (*William J. Kovatch, Jr.*), of counsel, for defendant.

*Kelley Drye & Warren LLP* (*Michael J. Coursey* and *R. Alan Luberda*), for defendant-intervenors the American Honey Producers Association and the Sioux Honey Association.


Eaton, Judge:  This action is before the court following remand for resolution of plaintiffs' USCIT Rule 56.2 motion for judgment upon the agency record.[1]  Defendant-intervenors, the American Honey Producers Association and the Sioux Honey Association (together, "defendant-intervenors"), challenge the finding of no critical circumstances in the United States Department of Commerce's ("Commerce" or "the Department") Results of Redetermination Pursuant to Remand (Dep't of Commerce Sept. 5, 2006), *Zhejiang Native Produce & Animal By-Products Import & Export Corp., et al. v. United States*, Court No. 02-00057) ("Remand Redetermination").  The Remand Redetermination resulted from the court's remand order in *Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. United States*, 30 CIT 725, Slip Op. 06-85 (June 6, 2006) (not reported in the Federal

---

[1]  "Plaintiffs" refers collectively to Zhejiang Native Produce & Animal By-Products Import & Export Corp.; Kunshan Foreign Trade Co.; China (Tushu) Super Food Import & Export Corp.; High Hope International Group Jiangsu Foodstuffs Import & Export Corp.; National Honey Packers & Dealers Association; Alfred L. Wolff, Inc.; C.M. Goettsche & Co.; China Products North America, Inc.; D.F. International (USA) Inc.; Evergreen Coyle Group, Inc.; Evergreen Produce, Inc.; Pure Sweet Honey Farm, Inc.; and Sunland International, Inc.

Supplement) (the "Remand Order"). Plaintiffs, and defendant the United States on behalf of Commerce, support the redetermination results, and ask the court to affirm the Remand Redetermination. Pls.' Comments Regarding Remand Redetermination ("Pls.' Comm.") 2; Response of the United States to the Comments of Pls. and Def.-Ints. upon the Dep't of Commerce's Final Results of Redetermination Pursuant to Court Order ("Def.'s Resp.") 1.

The court's Remand Order was made following the opinion of the United States Court of Appeals for the Federal Circuit (the "Federal Circuit") in *Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. United States*, 432 F.3d 1363 (Fed. Cir. 2005) ("*Zhejiang II*").[2]  *See* Remand Order, 30 CIT 725,

---

[2]  In related proceedings, following the issuance of *Zhejiang II*, plaintiffs moved for relief from the judgment in *Zhejiang I*.  Pls.' Rule 60(b) Mot. for Rel. from J. ("Pls.' Rule 60(b) Mot.") 1.  By their motion, plaintiffs sought an order directing Commerce to find that their sales made during the period of investigation, January 1, 2000 through June 30, 2000, were not made at less than fair value.  Pls.' Rule 60(b) Mot. 1-2.  The court denied plaintiffs' motion on September 26, 2007. *Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. United States*, Court No. 02-00057 (Sept. 26, 2007) (order denying plaintiffs's motion for relief from judgment). Plaintiffs appealed the court's order, and the court's proceedings were stayed on January 11, 2008, pending resolution of the appeal. *Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. United States*, Court No. 02-00057 (Jan. 11, 2008) (order staying proceedings).  The Federal Circuit dismissed plaintiffs' appeal holding that, because plaintiffs appealed an interlocutory order, the Court lacked jurisdiction to hear the matter. *Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. United States*, 339 Fed. Appx. 992, 993-94 (Fed. Cir. 2009) ("*Zhejiang III*") ("Except in a few well-defined circumstances, courts of appeals review final judgments,
(continued...)

Slip Op. 06-85.  In *Zhejiang II*, the Federal Circuit held that Commerce could not use its standard 25 percent method[3] to impute knowledge of below fair market sales to plaintiffs during a period that a suspension agreement was in place.  Thus, the Federal Circuit held that Commerce's critical circumstances determination was not supported by substantial evidence.  The Federal Circuit then remanded the matter to this Court where it was further remanded to Commerce.  *Zhejiang II*, 432 F.3d at 1368; Remand Order, 30 CIT at 725, Slip Op. 06-85 at 2.  On remand, Commerce reversed its previous determination and found that critical circumstances were not present during the period of investigation.

Defendant-intervenors argue that the court should once again remand the case to Commerce with instructions for it to determine whether critical circumstances were present by: (1) using a methodology other than the 25 percent method; and/or (2) using a

---

[2](...continued)
not particular issues as they arise in the course of trial proceedings.").  The Federal Circuit's mandate in *Zhejiang III* was subsequently issued on September 14, 2009.

[3]  Although it has never promulgated regulations, Commerce has adopted, as a general practice, a method for determining whether critical circumstances exist.  Using this method, Commerce imputes knowledge of sales at below fair value prices during the period of investigation, to those respondents whose dumping margins are calculated to be greater than 25 percent. *See* Honey From the PRC, 66 Fed. Reg. 24,102, 24,106 (Dep't of Commerce May 11, 2001) (notice of preliminary determination of sales at less than fair value).

period different from the period of investigation for making its

determination.  Defendant-Intervenors' Remand Comments ("Def.-

Ints.' Comm.") 3.

Jurisdiction is had pursuant to 28 U.S.C. § 1581© (2006) and

19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (B)(i) (2006).  For the

reasons set forth below, the Remand Redetermination is remanded.

BACKGROUND

The facts of this case are fully set forth in the court's

prior decision in *Zhejiang Native Produce & Animal By-Products

Import & Export Corp. v. United States*, 27 CIT 1827, Slip Op. 03-

151 (Nov. 21, 2003) (not reported in the Federal Supplement)

("*Zhejiang I*"), *Zhejiang II*, and the court's Order of September

26, 2007 denying plaintiffs' rule 60(b) motion for relief from

judgment.  A brief restatement of the case follows in order to

place this opinion in context.

In 1994, Commerce conducted an unfair trade investigation of

honey from the People's Republic of China ("PRC").  Commerce

subsequently halted this investigation and entered into a

suspension agreement with the PRC.  *See* Honey From the PRC, 60

Fed. Reg. 42,521 (Dep't of Commerce Aug. 16, 1995) (suspension of

investigation) (the "Suspension Agreement").  The Suspension

Agreement was in effect from August 16, 1995, through August 16,

2000.  Honey From the PRC, 65 Fed. Reg. 46,426 (Dep't of Commerce

July 28, 2000) (termination of suspended antidumping duty

investigation).  In 2000, following the Suspension Agreement's

termination, and at the urging of the domestic industry, Commerce

commenced a second investigation.  Honey from Argentina and the

PRC, 65 Fed. Reg. 65,831 (Dep't of Commerce Nov. 2, 2000)

(initiation of antidumping duty investigations) (the "Second

Investigation").  During the course of the Second Investigation,

the petitioners alleged the existence of critical circumstances.

*See* 19 U.S.C. § 1673b(e)(1).  Commerce identified the period of

investigation ("POI") as January 1, 2000, through June 30, 2000,

a period during which the Suspension Agreement was in effect.

During the course of its proceedings the Department used the POI

to determine both if respondents were dumping their merchandise

and for purposes of determining if critical circumstances were

present.  *See* Honey From the PRC, 66 Fed. Reg. 24,101, 24,106

(Dep't of Commerce May 11, 2001) (notice of preliminary

determination of sales at less than fair value) ("Preliminary

Results").

Following the investigation, Commerce's final determination

contained an affirmative dumping finding.  Honey From the PRC, 66

Fed. Reg. 50,608, 50,610 (Dep't of Commerce Oct. 4, 2001) (notice

of final determination of sales at less than fair value), *as

amended by* Honey from the PRC, 66 Fed. Reg. 63,670 (Dep't of

Commerce Dec. 10, 2001) (notice of amended final determination of

sales at less than fair value and antidumping duty order). The

final determination also contained an affirmative finding of

critical circumstances based on the 25 percent method's

imputation of knowledge of dumping. 66 Fed. Reg. at 50,6010.

This imputation of knowledge of dumping was predicated on the

Department's practice of considering

> margins of 25 percent or more for [export
> price] sales sufficient to impute knowledge
> of dumping . . . . In other words, in cases
> where, as here, export price is calculated by
> reference to sales made to unaffiliated
> purchasers in the United States, and Commerce
> determines that the antidumping duty margin
> with respect to those sales is 25% or more,
> Commerce "imputes" knowledge of dumping to
> the importer [during the period leading up to
> the investigation].

*Zhejiang I*, 27 CIT at 1842-43, Slip Op. 03-151 at 26. (footnote

omitted; first alteration in original). Commerce found that,

based on the 25 percent method, "there is evidence of the

knowledge of dumping . . . [that was] demonstrated by the fact

that Zhejiang, Kunshan, High Hope, and the PRC-wide entity all

have dumping margins of over 25 percent." *Id*. at 1843, Slip Op.

03-151 at 27 (citation omitted).

Plaintiffs sought judicial review in this Court of

Commerce's final determination and, among other things, objected

to Commerce's imputation of knowledge, arguing that compliance

with the Suspension Agreement foreclosed a finding of dumping

based on substantial evidence. The court rejected plaintiffs'

argument and held that the Suspension Agreement did not prevent Commerce from using its 25 percent method.  *Id.* at 1849-50, Slip Op. 03-151 at 36-37.  Therefore, the court sustained Commerce's affirmative critical circumstances determination.  *Id.* at 1851, Slip Op. 03-151 at 39.

Plaintiffs appealed *Zhejiang I* to the Federal Circuit.  *See generally Zhejiang II*, 432 F.3d at 1363-64.  On appeal, plaintiffs again argued that the existence of the Suspension Agreement prevented the imputation of knowledge of dumping using Commerce's 25 percent methodology.  *Id.* at 1366-67.  The Federal Circuit found that Commerce could not impute knowledge of dumping using the 25 percent method during the POI because the Suspension Agreement was in effect.  Therefore, the Federal Circuit reversed the court's critical circumstances holding, and remanded the case "for appropriate further proceedings."  *Id*. at 1368.

The court then remanded the matter to Commerce for reconsideration of the critical circumstances issue.  *See* Remand Order, 30 CIT at 725-26, Slip Op. 06-85 at 2-3.  Pursuant to the Federal Circuit ruling, the court instructed Commerce to further consider "its critical circumstances finding, provided that in no event shall Commerce impute to plaintiffs any knowledge prohibited by the [Federal Circuit]'s decision . . . ."  *Id.*

Following remand, Commerce filed its Remand Redetermination, finding that critical circumstances did not exist.  *See* Remand

Redetermination at 10.  Commerce wrote:

> Based on the [Federal Circuit]'s holding that
> the determination to impute knowledge of
> dumping [using the 25 percent method] while a
> suspension agreement was in place was not
> supported by substantial evidence, and the
> [Court of International Trade]'s instruction
> to the Department not to impute to plaintiffs
> any knowledge prohibited by the [Federal
> Circuit]'s decision, the Department finds
> that critical circumstances do not exist with
> respect to the antidumping investigation of
> honey from the PRC.

*Id.* at 8-9.


## STANDARD OF REVIEW

The court must uphold a final determination by the
Department in an antidumping proceeding unless it is "unsupported
by substantial evidence on the record, or otherwise not in
accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).


## DISCUSSION

I.  Commerce's Critical Circumstances Determination

The sole matter before the court is whether Commerce erred
in concluding that it could not use alternatives to the 25
percent method, or a time period other than the POI, to
investigate the presence of critical circumstances in this case.

A.  Legal Framework

     Section 1673d(a)(3) of Title 19 U.S.C. governs Commerce's

final critical circumstances determinations.[4]  19 U.S.C.

§ 1673d(a)(3).  This provision requires that, when Commerce makes

an affirmative final antidumping determination and the presence

of critical circumstances is alleged under 19 U.S.C. § 1673b(e),

the Department's final determination "shall also contain a

finding" of whether *either* (1) there is a history of dumping and

material injury by reason of dumped imports, *or* (2) the person by

whom, or for whose account, the merchandise was imported *knew or*

*should have known* that the exporter was selling the subject

merchandise at less than its fair value and that there would be

material injury by reason of such sales, *and* (3) there have been

massive imports of the subject merchandise over a relatively

short period.  *See* 19 U.S.C. § 1673d(a)(3)(A)-(B); 19 C.F.R. §

351.206(h) (2009).[5]  An affirmative critical circumstances

---

     [4]  *See Coal. for the Pres. of Am. Brake Drum & Rotor*
*Aftermarket Mfrs. v. United States*, 23 CIT 88, 112 n.38, 44 F.
Supp. 2d 229, 252 n.38 (1999) (quoting S. Rep. No. 103-412, 103d
Cong., 2d Sess., at 38 (1994)) ("This provision is 'designed to
address situations where imports have surged as a result of the
initiation of an antidumping or countervailing duty
investigation, as exporters and importers seek to increase
shipments of the merchandise subject to investigation into the
importing country before an antidumping or countervailing duty
order is imposed.'").

     [5]  Commerce's massive imports regulation provides in
relevant part:

                                                  (continued...)

determination permits Commerce to retroactively impose

antidumping duties "on merchandise entered up to 90 days before

the imposition of provisional measures."  *See* 19 C.F.R. § 351.

206(a); *see also* 19 U.S.C. § 1673d(c)(4)(A)-(B).


B.  The 25 Percent Method

In order to make a finding as to whether a respondent knew,

or should have known, that merchandise was being sold at less

than fair value, Commerce adopted the 25 percent method to impute

knowledge of below fair value sales.  *See, e.g.*, Certain

Cut-To-Length Carbon Steel Plate From The PRC, 62 Fed. Reg.

_____

[5](...continued)
(1) In determining whether imports of the
subject merchandise have been massive under
[19 U.S.C. §§ 1671d(a)(2)(B) or
1673d(a)(3)(B)], the Secretary normally will
examine:

(i) The volume and value of the
imports;

(ii) Seasonal trends; and

(iii) The share of domestic
consumption accounted for by the
imports.

(2) In general, unless the imports during the
"relatively short period" . . . have
increased by at least 15 percent over the
imports during an immediately preceding
period of comparable duration, the Secretary
will not consider the imports massive.

19 C.F.R. § 351.206(h) (citation omitted).

31,972, 31,978 (Dep't of Commerce June 11, 1997) (preliminary determination of sales at less than fair value);  Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from Italy, 52 Fed. Reg 24,198 (Dep't of Commerce June 29, 1987) (final determination of sales at less than fair value).  It is the method the Federal Circuit found could not be used here because of the Suspension Agreement.

C.  Alternative Methodologies and Time Periods

    The 25 percent method, however, is not the only way in which Commerce has imputed knowledge in past investigations.  Nor for that matter, has the Department restricted itself to the period of investigation in making critical circumstances determinations. Prior to its adoption of the 25 percent method, Commerce found that, with respect to respondents from non-market economies, it would use a case by case determination "using all available information and drawing upon market conditions of the industry subject to the investigation" when imputing knowledge of less-than-fair value sales.  Potassium Permanganate From the PRC, 48 Fed. Reg. 57,347, 57,349 (Dep't of Commerce, Dec. 29, 1983) (final determination of sales at less than fair value) ("*Potassium Permanganate*").

    For instance, in *Potassium Permanganate*, Commerce made a number of findings that it deemed relevant to its determination

that critical circumstances existed. First, that United States importers were aware that the merchandise purchased at "competitive prices" in the European market and subsequently imported into the United States originated from the PRC, and therefore were aware of the price of PRC-sourced potassium permanganate being sold in both United States and European markets. *Id*. Second, Commerce noted that importers were aware of the pricing of potassium permanganate from non-PRC sources and were therefore aware of the entire range of pricing in a marketplace where pricing was a major factor in determining sales. *Id.* Third, because other foreign producers operated in non-state-controlled countries, importers should have known, at least generally, what the value of the product was in market economy countries, and thus the minimum fair value of the PRC merchandise. *Id.* Fourth, that *during the period between the initiation of the investigation and the preliminary determination*, the unit price of the merchandise imported from the PRC was 22 percent less than the price imported from the only other foreign nation exporting the product to the United States. Potassium Permanganate From the PRC, 48 Fed. Reg. at 57,349. Lastly, because importers knew that the merchandise from the PRC was priced significantly below that sold for export by the only other non-United States market economy producer, importers should have known that the PRC exports were at less than fair value.

*Id.* Commerce's critical circumstances determination was upheld by both this Court and the Federal Circuit in *ICC Industries, Inc. v. United States*, 10 CIT 181, 632 F. Supp. 36 (1986), *aff'd* 812 F.2d 694 (Fed. Cir. 1987) ("*ICC Industries*").

Other Court of International Trade cases shed more light on practices, other than the 25 percent method, that can be used in making a critical circumstances determination. *See, e.g., Nippon Steel Corp. v. United States,* 24 CIT 1158, 118 F. Supp. 2d 1366 (2000). Specifically, the *Nippon* court listed "numerous press reports, . . . falling domestic prices resulting from rising imports, and domestic buyers shifting to foreign suppliers" as evidence that could support such a determination. *Id*. at 1168, 118 F. Supp. 2d at 1376 (internal quotation omitted).

In addition to demonstrating that the 25 percent method is not the only approach that Commerce has used to impute knowledge of sales at less than fair value, *ICC Industries* also reveals that Commerce has used at least one time period other than the period of investigation as the temporal measure for making a critical circumstances determination. In *ICC Industries*, the period used was "from [i]nitiation of this investigation to [the] Preliminary Determination."[6]  *ICC Industries*, 10 CIT at 184, 632 F. Supp. at 38.

---

[6]  Here, the Suspension Agreement ended on August 16, 2000. The domestic producers filed their petitions on September 29, 2000 and the preliminary results were published on May 11, 2001.

Indeed, the *ICC Industries* time period appears to be the period that Congress anticipated would be used in determining critical circumstances when it stated that the purpose of the critical circumstances statute was "to provide prompt relief to domestic industries suffering from large volumes of, or a surge over a short period of, imports and to deter exporters whose merchandise is subject to an investigation from circumventing the intent of the law by increasing their exports to the United States *during the period between initiation of an investigation and a preliminary determination by [Commerce].*" H.R. Rep. 96-317, 96th Cong., 1st Sess. at 63 (1979) (italics added).

In addition, Commerce, in its regulations, is directed to look at a period "beginning on the date the proceeding begins [*i.e.*, the filing of the investigation] and ending at least three months later." 19 C.F.R. § 351.206(i). Thus, it is clear that Commerce has the authority to evaluate time periods other than the period of investigation when making critical circumstances determinations.

II.  Commerce's Remand Redetermination

Commerce maintains that: (1) because it used the 25 percent method during the POI; and (2) because the Federal Circuit has prohibited the use of this method when the Suspension Agreement was in place, the administrative record lacks substantial

evidence that critical circumstances were present during the POI.
As a result, defendant insists that Commerce "properly concluded
that the record does not support a finding of critical
circumstances because no record evidence demonstrates that the
importers knew or should have known that honey from the PRC was
being imported at less than its fair value."  Def.'s Resp. 3
(citing 19 U.S.C. § 1673d(a)(3)(A)(ii)).

        Moreover, defendant argues:

> Whether, upon remand, Commerce should have
> changed its methodology and examined a time
> period other than the POI to determine
> whether importers had knowledge of dumping is
> beyond the scope of the remand order.
> [Defendant-intervenors'] allegation of error
> should, therefore, be rejected.

Def.'s Resp. 4.  With respect to this last statement, Commerce
insists that it "[did] not believe that [it had] the authority to
reopen the record and change the time period on which the
original finding of knowledge was based in this remand
proceeding."  Remand Redetermination at 10.

        Defendant-intervenors begin their argument in support of the
use of other reasonable methodologies for determining the
presence of critical circumstances, by taking account of
Commerce's history of making critical circumstances
determinations and noting Commerce's broad discretion in making
such determinations.  Def.-Ints.' Comm. 8.  Defendant-intervenors
insist that the 25 percent method is just one of a range of

reasonable methodologies Commerce has at its disposal. Def.-Ints.' Comm. 8. As a result, they reason that the 25 percent method, though Commerce's preferred way of determining knowledge when making a critical circumstances determination, is not its exclusive methodology. Def.-Ints.' Comm. 10. They note that Commerce had conducted critical circumstances inquiries "for years" before first using the 25 percent test and that no court has since limited Commerce solely to the application of that single test. Def.-Ints.' Comm. 10. They further assert that "Commerce and the reviewing courts have consistently referred to the 25 percent test as a '*general practice*' rule . . . and as the test Commerce will '*normally*' apply . . . in the knowledge-of-dumping context." Def.-Ints.' Comm. 10-11 (citing *Zhejiang II*, 432 F.3d at 1366; *see, e.g.,* Certain Cut-to-Length Carbon Steel Plate From the PRC, 62 Fed. Reg. at 31,978; Circular Welded Carbon Steel Pipes & Tubes From Thailand, 51 Fed. Reg. 3384, 3385 (Dep't of Commerce Jan 27, 1986) (notice of final determination)) (emphasis added). The use of language such as "general practice" and "normally" is, according to defendant-intervenors, indicative of Commerce's awareness that, "while the 25 percent test is the agency's preferred knowledge-of-dumping methodology, it is not suitable for every critical circumstances determination, and that there will be circumstances where an alternative methodology would be more appropriate." Def.-Ints.' Comm. 11. They further

maintain that both the language and legislative history of 19 U.S.C. § 1673b and § 1673e, as well as Commerce's regulations, support their argument that Commerce may focus its inquiry on the time period *between* the petition's filing and the issuance of the preliminary determination.  Def.-Ints.' Comm. 13

Accordingly, defendant-intervenors seek a further remand and a direction from the court that Commerce reopen the record and reconsider whether a finding of knowledge of sales below fair value is supported by substantial evidence under any methodology other than the 25 percent method.

III.  The Federal Circuit's Opinion in *Zhejiang II*

All of the parties rely on the Federal Circuit's opinion in *Zhejiang II* and the court's subsequent Remand Order in making their arguments.  For instance, Commerce maintains that the opinion prevents it from reopening the record and/or using an alternative methodology or considering an alternative time period to determine whether critical circumstances existed.  Remand Redetermination at 8-10.  For their part, plaintiffs argue that

> [s]ince the Federal Circuit considered all of the evidence of record, and found that the record did not contain evidence to support a finding that importers 'knew or should have known that the exporter was selling the subject merchandise at less than its fair value,' . . . the Department's determination on Remand that substantial evidence does not support a finding of critical circumstances is the only appropriate result.

Pls.' Comm. 3 (footnote omitted).  Reviewing both the Federal

Circuit opinion and the court's Remand Order, however, the court

finds nothing that limits Commerce in the way the Department

describes.

The Federal Circuit's holding in *Zhejiang II* in its entirety

is as follows:

> Zhejiang argues that the "knew or should have
> known" requirement for critical circumstances
> was not met, and that substantial evidence
> does not support the contrary finding based
> on imputation.  We agree.  As Zhejiang
> states, "it strains credibility to suggest
> that Commerce could establish minimum prices
> for honey designed to 'prevent the
> suppression or undercutting of price levels
> of the United States honey products' and then
> determine that U.S. importers purchasing
> honey in accordance with these pricing
> guidelines should have known these sales
> would be found to be at less than fair
> value."  When all factors are considered,
> there is not substantial evidence to support
> the finding of critical circumstances.

*Zhejiang II*, 432 F.3d at 1368 (internal citation omitted).  In

other words, the Court held that Commerce could not impute

knowledge of sales of less than fair value to plaintiffs using

the 25 percent method while the Suspension Agreement was in

effect.  The court did not otherwise limit Commerce's use of

alternative methodologies or limit the time period that Commerce

could examine to just the POI.

With the Federal Circuit's holding in mind, the court in its

Remand Order directed Commerce to "further [consider] its

critical circumstances finding, provided that in no event shall Commerce impute to plaintiffs any knowledge prohibited by the [Federal Circuit]'s decision . . . ." Remand Order, 30 CIT at 725-26, Slip Op. 06-85 at 2. The court's instructions to Commerce, therefore, directed it not to use the 25 percent method when the Suspension Agreement was in force. The court's Remand Order, however, did nothing to prevent Commerce from considering other methodologies or other time periods in making its critical circumstances determination. As has been seen, Commerce has used both other methodologies and at least one time period other than the period of investigation when investigating the presence of critical circumstances. Thus, neither the Federal Circuit's holding, nor the Remand Order constrained Commerce in these two areas. As a result, Commerce has the authority to exercise its discretion to apply any other reasonable method or look to any other reasonable time period in making its critical circumstances determination.


                               CONCLUSION

     Based on the foregoing, the court remands to Commerce and instructs the Department, using its discretion, to reconsider its critical circumstances determination found in the Remand Redetermination. In its Remand Redetermination the Department addressed the possibility of a remand:

> if the court considers that the remand order
> is sufficiently broad for the Department to
> consider the merits of the petitioners'
> argument concerning the time period used to
> analyze the issue of knowledge, and remands
> the proceeding to the Department to re-open
> the record for the submission of information
> on alternate time periods, we request that
> the Department be given six months time to
> complete that remand, as such time would be
> necessary in order for the Department to
> request additional information from the
> parties on alternative time periods, analyze
> and verify such information, issue a draft
> redetermination to the parties for comment,
> and submit a final redetermination to the
> Court.

Remand Redetermination at 10.  With this request in mind, the

court's remand order will take into account Commerce's suggested

time period to make any further determination with regard to

critical circumstances.

The remand results shall be due on September 24, 2010,

comments to the remand results shall be due on October 24, 2010,

and replies to such comments shall be due on November 8, 2010.


                                     /s/ Richard K. Eaton
                                     Richard K. Eaton


Dated:    March 24, 2010
          New York, New York